Michael P. Cooley (TX Bar No. 24034388)
Keith M. Aurzada (TX Bar No. 24009880)
Lindsey Robin (TX Bar No. 24091422)
BRYAN CAVE LLP
2200 Ross Avenue, Suite 3300
Dallas, Texas 75201
(214) 721-8000 (Telephone)
(214) 721-8100 (Facsimile)

*Proposed* Attorneys for the Debtors

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Matrix Broadcasting, LLC, et al., | § | Case No. 18-31045 |
| | § | |
| Debtors. | § | Joint Administration Requested |

**DECLARATION OF PETER HANDY IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Peter Handy, hereby declare as follows under penalty of perjury:

1. I am the chief executive officer of Matrix Broadcasting, LLC ("***Matrix***"), and Matrix Broadcasting Holdings, LLC ("***Holdings***" and, together with Matrix, the "***Debtors***"). In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2. On the date hereof (the "***Petition Date***"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").[1] The Debtors continue to operate their businesses and manage their properties as debtors in possession under §§ 1107(a) and 1108. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. I submit this declaration (this "***First Day Declaration***") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "***First Day Motion***"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations

---

[1] Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.

Page 1

and finances, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.
## GENERAL BACKGROUND

A.  **The Debtors' Business and the Events Leading to this Chapter 11 Filing.**

4. The Debtors were formed out of the 2014 acquisition by Digity Companies, LLC ("*Digity*"), of 33 stations from NextMedia Group Inc., which itself successfully emerged from chapter 11 in 2010. *In re NextMedia Group, Inc., et al.*, Case No. 09-14463 (Bankr. D. Del. Mar. 22. 2010). Among the 33 stations were two stations that NextMedia had previously spun off to a trust company, Mile High Station Trust, LLC ("*Mile High*"), following NextMedia's exit from bankruptcy, which severed its grandfathered ability to hold more radio stations in a single market than FCC regulations typically permit.

5. When Digity purchased the NextMedia stations, the two stations held by Mile High put Digity, too, over the legal ownership limit. To meet the ownership restrictions, Digity entered into a series of agreements with a newly-formed entity, Matrix Broadcasting, LLC, to purchase the two stations. As part of the transaction, Matrix and Digity agreed to have Digity eventually purchase the two stations once they could legally do so, and agreed to share certain resources. These agreements are described below in Part I.C.

6. Matrix financed the purchase of the Stations in May 2014 with a combination of secured and unsecured loans. These loans comprise the majority of the outstanding liabilities shown on the Debtors' balance sheet, and include secured term loan made in the original principal amount of $5,263,546.10 (the "*Term Loan*") and an unsecured loan made in the original principal amount of $1,000,000 (the "*Handy Loan*") by Matrix's members, Peter and Christine Handy (50%) and Star Media Group, Ltd. (50%).

7. Matrix now owns and operates the two Stations, which serve the Northwest suburbs of Chicago, Illinois, under the call signs WZSR (105.5 FM, "The Star") and WFXF (103.9 FM, "The Fox") (the "*Stations*"). WZSR "The

Star" broadcasts an adult contemporary music format in McHenry, Lake, and Kane Counties. WFXF "The Fox" is a classic rock station serving Kane, McHenry, Western Cook, and Kendall Counties. The chart below illustrates the approximate market served by each of the two stations, as well as the location of their studios in Crystal Lake, Illinois.



8. Holdings, which previously served as the sole member of Matrix, has no operations or assets but is a guarantor of the Term Loan.

B.  **The Debtors' prepetition capital structure**

9. The Term Loan was made under the terms of that certain Credit Agreement, dated May 4, 2014, between Matrix, as borrower, Holdings, as guarantor and additional loan party, Atalaya Administrative LLC ("*Atalaya*"), as administrative agent, and certain other lenders party thereto (the "*Senior Lenders*"). The proceeds of the Term Loan were used to finance Matrix's

Page 3

purchase of the two Stations. As of the Petition Date, Matrix was current on its obligations under the Term Credit Agreement.

10. The Term Loan is secured by first priority liens on and security interests in substantially all the Debtors' assets, including the Stations. Matrix Broadcasting Holdings, LLC, guaranteed repayment of the Term Loan on the terms set forth in the Guaranty and Collateral Agreement executed contemporaneously with the Credit Agreement. As additional credit support for the Term Loan, General Electric Capital Corporation issued an irrevocable standby letter of credit (the "***Letter of Credit***"), dated May 7, 2014, in the amount of $1,452,000 for the account of Digity in favor of Atalaya. Under the terms of the Term Credit Agreement, Atalaya may draw the Letter of Credit upon the occurrence of an event of default or under certain other enumerated conditions.

11. The Term Loan accrues cash interest at a rate equal to LIBOR+7.00% per annum, plus an additional 2.50% per annum in payment in kind interest, and has been paid current through the Petition Date. As of the Petition Date, the outstanding balance due under the Term Loan was approximately $4,020,000, which may be reduced to approximately $2,568,000 if the Letter of Credit is drawn.

12. The Handy Loan was made to provide additional liquidity necessary for the purchase of the two Stations. The Handy Loan accrues interest at 18% per annum, but no interest has been paid on the loan. As of April 4, 2018, therefore, $705,000 in unpaid interest had accrued under the Handy Loan.

**C.    The Shared Services Agreement and Option Agreement**

13. To facilitate Digity's later acquisition of the two Stations once it could do so consistent with FCC ownership guidelines, Matrix and Digity entered into a Shared Services Agreement (the "***Shared Services Agreement***") and a corresponding "***Option Agreement***", each dated as of May 9, 2014.

14. Upon information and belief, both the Shared Services Agreement and the Option Agreement were assigned to Alpha Media on or about February 25, 2016, as part of a broader acquisition by Alpha Media of radio stations and contract rights from Digity. Following the acquisition, Alpha Media delegated certain rights and responsibilities under the Shared Services Agreement back to Digity such that Digity continues to be the entity responsible for performance under the Shared Services Agreement. Upon information and belief, Alpha

Media pays Digity the sum of $6,000 per month to fulfill Alpha Media's obligations as Service Provider under the Shared Services Agreement.

*Shared Services Agreement*

15. Under the terms of the Shared Services Agreement, Digity contracted to provide certain technical, administrative, and other "back office" services to Matrix. In addition to these services, Digity provides Matrix with office space, tower space, equipment, and furnishings sufficient to enable Matrix to conduct its business and broadcast operations. These "Service Provider Premises" are provided to Matrix rent-free.

16. Under the Shared Services Agreement, Matrix is responsible for payment of all its operating expenses and, in addition, is required to pay Digity a service fee (the "*SSA Service Fee*") equal to $50,000 per month, of which $30,000 is permitted to be deferred under the Shared Services Agreement if there is insufficient cash flow to pay the service fee on a current basis. As additional consideration for the services provided by Digity under the Shared Services Agreement, Digity is permitted to sell for its own account up to 15% of Matrix's commercially available advertising time and to retain for itself all revenues generated from such "*Provided Advertising*" (as defined in the Shared Services Agreement).

17. Although Matrix is generally profitably, since the inception of the Shared Services Agreement Matrix has never generated sufficient cash flow to pay even the nondeferrable portion of the SSA Service Fee on a current basis.[2] Upon information and belief, as of April 4, 2018, approximately $2,250,000 in unpaid SSA Service Fees had accrued under the Shared Services Agreement.

18. The Debtors believe the SSA Service Fee and the value of the Provided Advertising far exceeds the reasonable value of the services provided under the Shared Services Agreement, and the Debtors intend to reject the Shared Services Agreement as of the Petition Date.

*Option Agreement*

19. Under the Option Agreement, Alpha, as assignee, holds the option to purchase the Stations and certain other enumerated assets (collectively, the

---

[2] Matrix made a one-time payment to Digity in the amount of $100,000 that was applied against the balance due under the SSA.

Page 5

"*Station Assets*") subject to prior FCC consent. The option is exercisable through 2022 by submission of a written notice of exercise of the option to Matrix.

20. The Option Agreement does not set a fixed purchase price for the Station Assets, but instead relies upon a process of employing one or more appraisers to prepare written appraisals to use in setting the purchase price.

21. In the event the appraised value of the Station Assets is less than the sum of the outstanding balance of the Term Loan, the Option Agreement sets a minimum purchase price equal to the unpaid SSA Service Fees, the Debtors' outstanding unsecured obligations to Peter Handy, and the Debtors' outstanding trade obligations.[3]

22. On the Petition Date, Matrix was otherwise generally current on their obligations to trade creditors and other ordinary unsecured creditors, and would be profitable but for the burden of the accruing SSA Service Fees.

## II.
## EVENTS LEADING TO THE CHAPTER 11 FILING

23. Regrettably, events have not unfolded as originally intended. Matrix originally expected to be divested of the two Stations within a year following the 2014 acquisition, and has worked actively since that time to find a buyer for one or both of the two Stations.

24. Instead, Matrix's sale efforts have been stymied by Digity and Alpha and, upon information and belief, Alpha itself remains unable to exercise the Option to purchase the stations without violating FCC ownership guidelines. Over the last three years, Digity and, to a lesser subsequent degree, Alpha have rejected proposals that would have not only ensured the payment in full of Atalaya, Digity, and all other creditors, but would also have allowed for the possibility of additional "upside" to Digity if the Stations later proved to be more valuable than anticipated.

25. In addition, the substantial accrued SSA Service Fees have placed a drag on Matrix's balance sheet that has made it impossible to refinance the Term Loan, and Alpha Media and Digity have been unwilling to renegotiate the terms of the Shared Services Agreement to reflect both the changed circumstances of the transaction and a more realistic assessment of the value of the services

---

[3] Alternatively, in that event Digity may elect to withdraw its election to exercise the option.

Page 6

provided thereunder. With the maturity of the Term Loan approaching on March 31, 2018, Matrix had no choice but to seek relief in chapter 11 in order to preserve the ongoing business operations and enterprise value of Matrix for the benefit of its employees, creditors, and stakeholders.

### III.
### EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

26. Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions[4] seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity. The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of these chapter 11 cases. I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

### A.  Availability of Financial and other Company Information

27. By virtue of the shared services arrangement under the Shared Services Agreement, much of the Debtors' financial and other business records are in the possession of Digity.

28. Because of the sensitivity of the Debtors' decision to seek relief in chapter 11 and the possibility that either or both of Digity or Atalaya might seek to upset the Debtors' reorganization strategy, the Debtors could not disclose their intentions to Digity prior to the commencement of these cases. As a result, on the Petition Date the Debtors did not have immediate access to certain of the information necessary to complete the creditor "mailing matrix" and to prepare a list of the Debtors' 20 largest unsecured creditors.

29. With the cases now commenced, the Debtors are taking all necessary steps to obtain the necessary information to satisfy their reporting obligations under the BAnkruptcy Code and the Bankruptcy Rules, and anticipate filing a supplemental mailing matrix and "20 largest creditors" list within the next few business days.

---

[4] Capitalized terms used but not defined herein have the meanings assigned to them in the corresponding First Day Motion.

Page 7

**B.     Motion for Joint Administration**

30.    Each Debtor is an affiliate of the other as defined in § 101(2) and therefore qualifies for joint administration under Rule 1015(b). Specifically, at least 20% of the outstanding voting securities of each of Matrix and Holdings are owned or controlled by the same person, Peter Handy. 11 U.S.C. § 101(2)(B).

31.    The Debtors believe that the joint administration of these Chapter 11 Cases is warranted by the fact that (i) the financial affairs and business operations of the Debtors are closely related, and (ii) administrative expenses are shared by the Debtors. Entry of an order directing joint administration of these Chapter 11 Cases will obviate the need for duplicative notices, applications and orders, and will thereby save considerable time and expense for the Debtors and result in substantial savings to their respective estates.

32.    Furthermore, the creditors will not be adversely affected by joint administration of these cases. This Motion requests only administrative consolidation of the estates; the Debtors are not at this time seeking substantive consolidation. Each creditor may still file a claim against a particular Debtor's estate. Thus, the rights of all creditors will be enhanced by the reduced costs resulting from joint administration. This Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files. Finally, supervision of the administrative aspects of these Chapter 11 Cases by the Office of the United States Trustee will be simplified.

**C.     Notice of Designation as Complex Chapter 11 Case**

33.    This case involves two separate Debtor entities, and well over fifty parties in interest in this chapter 11 case, including secured creditors, working capital lenders, equipment lessors, utility providers, suppliers, and vendors. Accordingly, the Debtors submit that these cases warrant designation as a complex chapter 11 case under the Local Bankruptcy Rules applicable in this district.

**D.     Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Granting Certain Adequate Protection in Connection Therewith**

34.    The Debtors have cash and accounts on hand as of the Petition Date and will continue to generate cash and accounts during the case from their normal business operations, all of which may constitute "cash collateral" as that term is defined by § 363(a) (as so defined, the "*Cash Collateral*").

35. The Debtors believe that Atalaya claims an interest in various types of the Debtors' property that would constitute Cash Collateral, including revenue derived from the operation of the Debtors' business and the proceeds of receivables and other collateral. For purposes of the Motion, the Debtors assume that Atalaya has a colorable claim to rights in the Debtors' Cash Collateral.

36. The Debtors bring this Motion on an emergency basis given the immediate and irreparable harm that the Debtors will suffer if they cannot use Cash Collateral to pay postpetition operating expenses, including employee payroll, that arise in the ordinary course of their ongoing business operations. The use of Cash Collateral will permit the Debtors to preserve the value of their estates, continue operations, maintain jobs for their employees, service ongoing disbursements, and satisfy other working-capital and day-to-day needs.

37. Absent immediate use of Cash Collateral, the Debtors would likely have to cease business operations immediately, to the material detriment of their vendors, advertisers, employees, stakeholders, and other parties in interest. Therefore, the Debtors need to ensure the availability of such working capital now. This liquidity is necessary for the Debtors to reorganize and demonstrate to their customers, vendors, and stakeholders that it has sufficient capital to ensure ongoing operations.

38. The Debtors have prepared the Budget to demonstrate that they can operate within fixed budgeted amounts while still generating cash flow and providing adequate protection for any interest Atalaya is ultimately determined to have in the Cash Collateral. The Debtors request authority to use Cash Collateral for the purposes listed in the Budget and in the amounts budgeted. In addition to ordinary operating expenses, the Budget includes a $100,000 retainer payable to Bryan Cave LLP, which Atalaya barred the Debtors from funding prior to the Petition Date.

**E.     Motion for an Order Authorizing the Debtors to (i) Pay Certain Prepetition Wages and Other Compensation and (ii) Continue Employee Benefits Programs**

39. As of the Petition Date, Matrix employs approximately 32 employees who are paid on a semi-monthly basis, including 19 salaried employees and approximately 13 hourly employees (collectively, the "*Employees*"). The Employees are responsible for the ongoing business operations of the Debtors, and their skills, knowledge and understanding with

Page 9

respect to the Debtors' operations are essential to the effective reorganization of the Debtors' financial affairs.

*Wage Obligations*

40. In the ordinary course of business, the Debtors pay their Employees on a semi-monthly basis in arrears. The Debtors fund the required payroll amount to their payroll processor ADP. The Debtors' aggregate gross monthly payroll (including payroll taxes and garnishments) is approximately $130,900.00.

41. The only prepetition wages and salaries owed to Employees are those that accrued during the most recent payroll period extending from March 15, 2018, through the Petition Date. The Debtors estimate that total prepetition wages and salaries (excluding vacation time) earned by the Employees prior to the Petition Date that have accrued and remain unpaid (collectively, the "***Wage Obligations***") total approximately $55,000.00 (including (i) payroll tax withholding, (ii) garnishments, and (iii) health benefit and other deductions (the "***Deductions***")). Upon information and belief, no single employee is owed more than the statutory cap imposed by § 507(a)(5).

42. By this Motion, the Debtors seek authority to pay and honor the prepetition Wage Obligations and to continue to honor the Wage Obligations on a post-petition basis in the ordinary course of business.

*Unpaid Payroll Taxes*

43. By law, employers are required to withhold amounts from employees' wages that are related to federal, state, provincial, and local income taxes, including social security, Medicare taxes, and unemployment insurance, for remittance to the appropriate taxing authorities (collectively, the "***Payroll Taxes***"). The Debtors file a Form 941 quarterly, and currently owe approximately $250.00 in interest to the IRS and approximately $9,000.00 in outstanding liabilities (collectively, the "***Unremitted Payroll Taxes***"). The Debtors request authority to pay Unremitted Payroll Taxes.

44. The Debtors do not believe they are in possession of any Unremitted Payroll Taxes except as noted above. The Payroll Taxes are withheld by ADP and held in trust for payment to third parties, and thus, do not constitute property of the Debtors' estate. The Debtor, in an abundance of caution, seeks authority to remit the Unremitted Payroll Taxes, if any, and to continue collecting

and remitting the Payroll Taxes in the ordinary course of business on a post-petition basis.

*Paid Time Off and Other Benefits*

45. Employees are awarded vacation time ("**PTO**") at the beginning of each calendar year. Unused PTO remaining at the end of the year does not accrue and carry forward from year to year. It expires at the end of each calendar year. Employees are not permitted to cash-out PTO hours on demand; however, upon termination of employment, the Debtors' practice has been to pay terminated hourly employees for any accumulated unused PTO.

46. At the Petition Date, salaried employees had approximately 193 days of unused 2018 PTO remaining on the Debtors' books with an approximate value of $37,204.08, plus another unused 106 vacation days earned by sales personnel.[5]

47. The Debtors request authority to permit their Employees to use accrued PTO and other leave, and further requests authority to pay accrued PTO to terminated Employees consistent with the Debtors' past business practices and contractual obligations.

*Employee Benefit Plans*

48. The Debtors maintain various employee benefit plans and policies for health care, dental, vision, short-term and long-term disability, and life insurance, and flexible spending accounts (collectively, and as discussed in more detail below, the "**Employee Benefits**"). Eligible employees are not required to participate in the Employee Benefits programs offered by Debtors.

Medical Insurance

49. The Debtors provide their Employees with medical insurance through UnitedHealthcare (the "**Medical Plan**"). The Employee portion of the cost of the Medical Plan is deducted each payroll period from the Employee's total pay.

Dental and Vision Insurance

---

[5] Sales personnel are paid on a commission basis such that their compensation fluctuates from month to month. Accordingly, their PTO is recorded only by number of days.

Page 11

50. The Debtors offer Employees the option to purchase dental and vision insurance coverage through Guardian Insurance Company of America (the "***Dental and Vision Plans***"). The Dental and Vision Plans are 100% employee funded. The Debtors seek authorization to transfer the Employees' portion of all payments for Employee-Funded Supplemental Benefits, including honoring any checks issued prepetition but not cleared as of the Petition Date.

51. Because the Dental and Vision Plans are vital to the Employees and because the funds constituting unpaid Dental Plan are held in trust for the Employees and are not property of the Debtors' estates, the Debtors seek authority to remit all prepetition amounts owing for the Dental Plan, and to continue providing the Dental Plan in the ordinary course of business on a post-petition basis.

Life and Disability Coverage

52. In addition, the Debtors also provide Employees with life insurance and short-term disability insurance through Lincoln Financial (collectively, the "***Employer-Funded Supplemental Benefits***"). The Debtors fully fund short-term disability and basic life insurance. The premium cost for all Employer-Funded Supplemental Benefits are 100% funded by the Debtors. Employees also have the option to purchase additional life insurance and long-term disability insurance, which are 100% employee funded.

53. Because the Life and Disability Coverage is vital to the Employees, the Debtors seek authority to remit all prepetition amounts owing for Employer-Funded Supplemental Benefits, and to continue providing the Employer-Funded Supplemental Benefits in the ordinary course of business on a post-petition basis.

Flex Spending Account

54. The Debtors provide their Employees the opportunity to participate in a flex spending account (the "***Flex Spending Account***") managed by UnitedHealthcare Managed. For participating Employees, flex spending account funds are deducted from the Employees' payroll and deposited in the Flex Spending Account by ADP as part of their payroll processing service.

55. The Debtors request authority to continue offering Employees the ability to participate in the Flex Spending Account. The failure to pay any Employee or to provide the Health Benefits or allow participation in the Flex

Spending Account would have a very negative impact on Employee morale and would almost certainly result in a decrease in performance that would be detrimental to the Debtors' business.

56. Upon information and belief, no Employee's total combined Wage Obligations and Health Benefits exceeds the § 507(a)(4) priority claim limit of $12,850 earned within the 180 days prior to the Petition Date. Accordingly, to preserve the Debtors' ongoing business operation, the Debtors respectfully submit that the Employees should be allowed payment all of the Wage Obligations and other prepetition Employee Benefits in any event as priority claims.

**F.    Motion for an Order (i) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (ii) Approving Deposit Account as Adequate Assurance of Payment, and (iii) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment**

57. In the normal conduct of its business operations, the Debtor has relationships with certain providers of utility services (each a "*Utility Company*"), including each of the Utility Companies identified on Exhibit A to the Motion.[6] The Utility Companies, which provide the Debtor with electric, telephone, and similar utility products and services (collectively, the "*Utility Services*"), are identified on the list attached to the Motion as Exhibit A.

58. The Debtor pays approximately $6,950.00 per month to the Utility Companies for Utility Services provided, and is current on its monthly obligations to each of the Utility Companies except for obligations pertaining to Utility Services that have been invoiced to the Debtor for which payment is not yet due and Utility Services that have been provided since the end of the last billing cycle but not yet invoiced to the Debtor. None of the Utility Companies holds a security deposit paid by the Debtor to secure payment for Utility Services.

59. Uninterrupted Utility Services are essential to the continued operations of the Debtor's business. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. Such a disruption would be extremely harmful to the Debtor's business and would jeopardize the Debtors' efforts to reorganize and successfully

---

[6] While the Debtor has used its best efforts to identify all of its Utility Companies on Exhibit A, the Debtor may have inadvertently omitted one or more Utility Companies from Exhibit A. Accordingly, the Debtor requests leave to amend Exhibit A to add any additional Utility Company without further order of the Court, and that the relief requested herein apply to any such entity added to Exhibit A.

Page 13

emerge from chapter 11. It is critical to the Debtors' swift, successful emergence from chapter 11 that Utility Services continue uninterrupted.

### G. Motion for an Order Authorizing the Debtors to Maintain and Administer Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto

60. As a radio broadcasting company, the Debtors' primary customer constituency (the "*Advertising Customers*") is its advertisers. Like other radio broadcasters, the Debtors generate substantially all of their revenue from the sale of advertising. The Debtors' advertising segments are diversified, and approximately 80% of the Debtors' gross revenue is generated by local advertisers.

61. Advertising Customers are essential to the Debtors' business. The Debtors must maintain strong relationships with their Advertising Customers given the increasing pressure and competition from other radio broadcasters and advertising mediums that they face. The filing of the Chapter 11 Cases will inevitably exacerbate these industry headwinds. The Debtors need to ensure their Advertising Customers that the filing of these cases will not adversely impact their business relationships with the Debtors and will not interfere with the Debtors' ability to fully satisfy the Advertising Customers' needs or otherwise result in increased pricing.

<u>Prepaid Advertising Sale Obligations</u>

62. From time to time, the Debtors will require an Advertising Customer that does not qualify for ordinary 30-day net payment terms to prepay for advertising on a weekly or monthly basis. The Debtors record these prepayments as credits on the Debtors' accounts receivable ledger until the advertisement is aired and an invoice is applied against the prepayment. Accordingly, until such time as the Debtors air the advertisement, the Debtors owe a performance obligation to their Advertising Customer in the amount of the corresponding prepayment.

63. The Debtors estimate that, as of the Petition Date, they have approximately $3,000 in accrued but unsatisfied performance obligations on account of prepaid advertising sales. The Debtors seek authority to honor and satisfy such obligations in the ordinary course of business.

<u>Prepaid Events</u>

Page 14

64. In the ordinary course of business, the Debtors produce remote broadcast events, promotional events, and other public events (the "**Prepaid Events**"). The production of Prepaid Events involves costs associated with equipment and venue rentals, as well as payment to attending performers. The Debtors generally sell their Advertising Customers sponsorships of the Prepaid Events, which affords the Advertising Customers the ability to be included in promotional materials or obtain other advertising rights related to the Prepaid Event. Advertising Customers prepay Matrix to participate in these Prepaid Events. At any given time, therefore, the Debtors may have obligations to honor sponsorship and advertising related to organized events taking place some time in the future.

65. The Debtors estimate that as of the Petition Date, they may have some minimal accrued but unpaid obligations relating to Prepaid Events. The Debtors seek authority to honor and satisfy any claims in the ordinary course of their business.

Advertiser Incentive Programs

66. From time to time, the Debtors operate advertiser incentive programs (the "**Advertiser Incentive Programs**") designed to encourage either (a) new Advertising Customers to purchase advertising time or (b) existing Advertising Customers to increase their advertising "spend" with the Debtors. For example, the Debtors recently concluded an Advertiser Incentive Program in which Advertising Customers would receive a $100 Visa gift card with the purchase of a qualifying advertising package.

67. As of the Petition Date, the Debtors had approximately $2,100 of accrued but unsatisfied obligations on account of the Advertiser Incentive Programs. The Debtors seek authority to honor and satisfy any claims based on Advertiser Incentive Programs.

68. Continuing to administer the Customer Programs without interruption during the pendency of these Chapter 11 Cases is critical to preserve the value of the Debtors' assets by, most importantly, preserving customer goodwill and market share. This value will inure to the benefit of the Debtors' estates and their creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: March 27, 2018
       Dallas, Texas

                                                 Peter Handy
                                                 Chief Executive Officer

Filed by:

/s/ Michael P. Cooley
Michael P. Cooley (TX Bar No. 24034388)
Lisa M. Marshall (TX Bar No. 24092764)
2200 Ross Avenue, Suite 3300
Dallas, Texas 75201
(214) 721-8000 (Telephone)
(214) 721-8100 (Facsimile)
michael.cooley@bryancave.com

*Proposed* Attorneys for the Debtors

## CERTIFICATE OF SERVICE

The undersigned certifies that, on March 27, 2018, a true and correct copy of the foregoing document was served via first class mail or via the Court's Electronic Case Filing (ECF) System to (or to counsel for) (i) the Debtors; (ii) the Office of the United States Trustee; (iii) Atalaya Administrative LLC; (iv) Digity Companies, LLC; (v) Alpha Media LLC; (vi) the creditors believed to hold the twenty largest unsecured claims against the Debtors; (vii) those persons who have formally appeared and requested notice and service in this case; and (viii) all governmental agencies having a regulatory or statutory interest in this case.

                                                /s/ Michael P. Cooley
                                                Michael P. Cooley